1 | LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
2 | DANIEL S. MILLER (State Bar No. 218214)
dmiller@millerbarondess.com
3 | BRIAN A. PROCEL (State Bar No. 218657)
bprocel@millerbarondess.com
4 | CALEB E. MASON (State Bar No. 246653)
cmason@millerbarondess.com
5 | MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
6 | Los Angeles, California 90067
Telephone:   (310) 552-4400
7 | Facsimile:   (310) 552-8400

8 | Attorneys for Plaintiff
Brian C. Mulligan

9

**FILED**

2013 FEB -6  PM 1:55

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

10 |               **UNITED STATES DISTRICT COURT**

11 |               **CENTRAL DISTRICT OF CALIFORNIA**

12

13 | BRIAN C. MULLIGAN, an individual,

14 |                    Plaintiff,

15 | v.

16 |

17 | JAMES NICHOLS, an individual; JOHN
MILLER, an individual; THE CITY OF
18 | LOS ANGELES, an entity; TYLER
IZEN, an individual; LOS ANGELES
19 | POLICE PROTECTIVE LEAGUE, a
corporation; and DOES 1-10, inclusive,
20 |
21 |                    Defendants.
22 |
23 |
24 |
25 |
26 |
27 |
28 |

CASE NO. **CV13-00836-RGK**
(VBKx)

**COMPLAINT FOR:**

1. **VIOLATION OF CIVIL RIGHTS
   UNDER 42 U.S.C. § 1983
   (EXCESSIVE FORCE)**

2. **VIOLATION OF CALIFORNIA
   CIVIL CODE § 52.1 (EXCESSIVE
   FORCE)**

3. **ASSAULT AND BATTERY**

4. **FALSE IMPRISONMENT**

5. **POLICE NEGLIGENCE**

6. **VIOLATION OF CIVIL RIGHTS
   UNDER 42 U.S.C. § 1983
   (RETALIATION)**

7. **VIOLATION OF CALIFORNIA
   CIVIL CODE § 52.1
   (RETALIATION)**

8. **NEGLIGENT SUPERVISION**

**DEMAND FOR JURY TRIAL**

_MILLER BARONDESS, LLP_
_ATTORNEYS AT LAW_
_1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067_
_TEL (310) 552-4400   FAX (310) 552-8400_

140886.1

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# INTRODUCTION

1.      For more than two years, the Los Angeles Police Department ("LAPD") knowingly harbored among its officers a serial predator, Officer James Nichols ("Nichols"), who has a history of using threats, fear and his badge to abduct and assault people.  The LAPD was warned about Nichols, but did nothing to stop him, and as a consequence his assaults continued, including the brutal beating of the Plaintiff herein — Brian Mulligan ("Mulligan").

2.      In or about 2010, the LAPD learned that Nichols was using the threat of arrest to extort sex from women in the Hollywood Division, where he was assigned. Nichols' assaults followed a pattern: he would approach a vulnerable victim, detain her, drive her to a secluded location, then use the power of his badge to demand sex under threat of arrest and imprisonment.  Nichols did this repeatedly, over a period of years, and the LAPD knew about it.

3.      Despite complaints from victims of Nichols' assaults, the LAPD took no action to protect the public from Nichols.  The LAPD left Nichols on patrol, where he continued to use his badge and police powers to engage in predatory assaults.

4.      Despite receiving reports of Nichols' abuse of power, the LAPD transferred Nichols from the Hollywood Division to the Northeast Division.  There, on May 15, 2012, Nichols employed his modus operandi on Mulligan — find a vulnerable victim, detain the victim, transport the victim to a secluded location, and threaten violence and arrest if the victim doesn't comply with his demand.  But this time it wasn't for sex.

5.      This time Nichols used — and abused — his power for another purpose. Nichols took Mulligan against his will to the Highland Park Motel and ordered him to check in and spend the night there, knowing for a fact, because he counted it, that Mulligan had thousands of dollars in cash in his possession.  It was a setup.

6.      Nichols told Mulligan he'd be "dead" if he left the room.  But unlike Nichols' previous victims, Mulligan didn't comply.  Mulligan left the motel, and

140886.1

when he did, Nichols found him and beat him within an inch of his life.

7.     If the LAPD had properly investigated, monitored and supervised this predator, he would have been off the street long before May 15, 2012, and the setup and brutal beating of Brian Mulligan would not have occurred.

**The Beating of Plaintiff Brian Mulligan.**

8.     On the night of May 15, 2012, Mulligan was minding his own business. He went to the Los Angeles neighborhood of Eagle Rock to visit a legal, licensed dispensary to purchase THC pills for use as a sleep aid on the long flights he frequently took for business.

9.     While walking in the neighborhood, Mulligan was stopped by Nichols and his partner, Officer John Miller ("Miller"). Nichols and Miller questioned Mulligan and gave him a field sobriety test. Mulligan passed the sobriety test. Nichols and Miller concluded that Mulligan was not under the influence of alcohol or drugs, but they did not let him go. They handcuffed him and searched him, but found nothing illegal. They still did not let him go. Instead, they placed him in the back of their patrol car, and drove him to his car. They searched Mulligan's car, without his consent, and discovered approximately $3,000 in cash he had in the car. (Mulligan traveled extensively for business and regularly carried cash.)

10.     Nichols and Miller did not arrest Mulligan. There was nothing to arrest him for; he had done nothing wrong. They described him as "calm and cooperative." They found nothing illegal on his person or in his car. But they still would not let him go. Mulligan asked why he couldn't just drive home; Nichols and Miller told him to "shut the fuck up." Mulligan asked to call his wife to come pick him up — he lived minutes away; Nichols and Miller refused. Mulligan asked to call a taxi; Nichols and Miller again refused. Mulligan asked whether they would drive him home, since they would not let him leave on his own. They said no.

11.     Instead, they told Mulligan they were taking him to a motel, and forcibly transported him, handcuffed in the back of their patrol car, to the Highland Park

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Motel.   They walked Mulligan into the lobby and ordered the desk clerk to rent Mulligan a room.  They then walked Mulligan to the room, and handed him his approximately $3,000 in cash.  They ordered Mulligan not to leave the motel room before morning and said that, if he did, he was "a dead motherfucker."  They gave Mulligan's car keys to the desk clerk and told the clerk to hold the keys until morning.

12.    Mulligan suspected something was amiss; he worried he was being set up.  He was tired and scared and wanted to get home to his family.  He disobeyed Nichols' and Miller's order.  After Nichols and Miller left, Mulligan waited about ten minutes and fled the motel.  But then he encountered Nichols and Miller again.

13.    They approached Mulligan in their patrol car, got out and came toward him.  Mulligan was terrified and tried to run.  They attacked him.  Nichols hit Mulligan in the face with his baton, swinging it like a baseball bat, shattering Mulligan's nose and knocking Mulligan to the pavement.  Nichols and Miller then beat Mulligan in the head.  Mulligan, bleeding profusely and drifting in and out of consciousness, pleaded with them to stop.

14.    Nichols and Miller put Mulligan on the curb and handcuffed his hands behind his back.  Nichols leaned close to Mulligan and said, "You're going to die tonight of a heroin overdose."  Nichols then inserted his baton under Mulligan's arms and torqued Mulligan's shoulders back, breaking Mulligan's scapula (shoulder blade). He repeated the maneuver, breaking the bone again, telling Mulligan he was giving him "some more heroin."  Mulligan thought he was going to die there on the sidewalk.

15.    Mulligan suffered life-threatening injuries, required emergency facial surgery, and has undergone, and is still undergoing, additional surgery and months of therapy in an effort to repair the severe physical and psychological damage inflicted by Nichols and Miller.

16.    At the time of the incident, Nichols was under investigation by the LAPD's Internal Affairs Division, for assaulting women using a similar modus operandi to the one he employed with Mulligan: detaining them; transporting them by

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552 4400  FAX: (310) 552 8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

threat and force to a private location; and ordering them to be compliant.  For Nichols, it was all about the use — and abuse — of power.

17.    The Internal Affairs investigation began in or about 2010, but the LAPD did not protect the public from Nichols.  Instead, it simply transferred him from the Hollywood Division to the Northeast Division, where he continued his sadistic and predatory acts, and eventually brutalized Mulligan.

18.    The LAPD failed to adequately and properly supervise Nichols so as to prevent his assaults, including his assault on Mulligan.

19.    The harm inflicted on Mulligan didn't stop with the physical injuries he sustained.  In August 2012, after Mulligan consulted an attorney about filing a claim against the City, the LAPD leaked to the media the false and inflammatory police report written by Nichols and Miller.  The LAPD, through its spokesperson Lt. Andrew Nieman, held a press conference and blamed Mulligan for his own beating.

20.    In October 2012, after Mulligan filed his claim against the City, the LAPD retaliated again.  This time, the LAPD conspired with the police union, the Los Angeles Police Protective League ("LAPPL"), and its President, Tyler Izen ("Izen"), to smear Mulligan in the media, impugn his reputation, malign him, dissuade him, and prejudice his right to legal recourse.  This smear campaign cost Mulligan his job.

21.    As explained below, the LAPD leaked confidential material from its internal use-of-force investigation to the LAPPL and Izen, in a concerted and malicious scheme to punish Mulligan and intimidate him from pursuing legal redress.

22.    The LAPPL and Izen, in conspiracy with the LAPD, issued a press release, asserting that Mulligan was a dangerous, delusional drug addict.  They named his employer — Deutsche Bank — and insinuated that bankers like Mulligan are untrustworthy schemers.  They said that Mulligan had gotten what he had coming to him and that, if he didn't drop his legal claims, he would be "held accountable."

23.    They posted on the internet an audio recording of Mulligan made by a Glendale police officer on May 13, 2012, two days before the beating.  Mulligan had

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

140886.1

gone to the Glendale police station that day to ask for information about a product he had recently been given.  The product was legal, but Mulligan was concerned about it.  So he went to his local police station and asked an officer for advice.  The conversation was cordial and lasted about ten minutes, at which point the officer wished Mulligan well, and Mulligan left.

24.    The Glendale Police Department gave that recording to the LAPD officers conducting the LAPD's official use-of-force investigation of Nichols and Miller.  But the LAPD had another use in mind for it.  After Mulligan filed his claim against the City, the recording surfaced on the LAPPL website, as part of the press release maligning Mulligan and labeling him a delusional drug addict.

25.    The LAPD, the LAPPL and Izen labeled Mulligan a delusional, violent drug addict despite the fact that Nichols and Miller tested Mulligan and said in their report that they did not think Mulligan was on drugs; despite the fact that no drugs were found on Mulligan or in his car; and despite the fact that Mulligan tested negative for drugs at the hospital.

26.    The LAPD, the LAPPL and Izen conspired to use falsehoods and threats to humiliate Mulligan, tarnish his reputation, punish him and retaliate against him for asserting a claim, and destroy his chances of getting a fair hearing in court.  Their ploy caused Deutsche Bank to fire Mulligan from his job.

27.    Police officers, police departments and police unions are not supposed to conduct themselves this way in a society based on the rule of law.  They are not supposed to "go after" people who assert claims; they are not supposed to intimidate claimants to dissuade them from seeking legal recourse.

28.    But that is exactly what the LAPD, the LAPPL and Izen conspired to do, and did, here.  They engaged in a coordinated and systematic effort to destroy a man's career and his life.  As a result, all are named as Defendants herein as "state actors" for conspiring to engage in, and engaging in, "joint activity" in violation of Mulligan's civil rights.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**PARTIES**

29.    Brian Mulligan is an individual residing in the Central District of California.  At all times relevant to the allegations in this complaint, Mulligan was and is a California resident.

30.    Mulligan was born and raised in the Los Angeles area.  He grew up in Glendale, worked hard in school, and was a three-sport athlete at Hoover High School, where he quarterbacked the football team.  He received his bachelor's degree with honors from USC and his masters of business administration with honors from UCLA.

31.    Mulligan is self-made and has worked hard to build a successful career. He worked his way through college, then began his career as a CPA, rising through the ranks at Price Waterhouse.  He has earned a number of professional licenses, including a CPA license and a Chartered Global Management Accountant license, and he is licensed by the Financial Industry Regulatory Authority.  He has held a number of executive positions in the finance and entertainment industries, including Chief Financial Officer and Executive Vice President of the parent company of Universal Pictures; Co-Chairman of Universal Pictures; Chief Executive Officer of Universal Television; Chief Financial Officer of Seagram Universal; and Chairman of FOX Broadcasting and CableGlobal.  Most recently he was Vice Chairman of Media & Telecom Investment Banking at Deutsche Bank, where he took his division from eighth place to first place in revenue.

32.    Mulligan has been involved with numerous charities, including raising money for local hospitals, shelters and high schools.  He's also been a youth football and basketball coach.  His family roots are in the Glendale area.

33.    The LAPD is an agency of Defendant City of Los Angeles; the City is responsible for the actions of the LAPD and its officers.

34.    On information and belief, at all times relevant hereto, Defendants Nichols and Miller, and Unknown Defendants Does 1 through 10, were residents of the County of Los Angeles.

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552 4400   FAX: (310) 552 8400

140886.1

35.     At all times relevant hereto, Defendant Los Angeles Police Protective League was a California corporation, headquartered at 1308 W. Eighth St., Los Angeles, California, 90017, in the County of Los Angeles.

36.     At all times relevant hereto, Defendant Tyler Izen was President of the Los Angeles Police Protective League and a resident of the Central District of California.

37.     Mulligan is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 10, and therefore sues these Unknown Defendants by such fictitious names.  Mulligan will amend this complaint to allege said Defendants' true names and capacities when ascertained.  Mulligan is informed and believes that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Mulligan's injuries were proximately caused by the acts and/or omissions of said fictitiously named Defendants.

## JURISDICTION AND VENUE

38.     This is a civil suit brought under the Civil Rights Act, 42 U.S.C. § 1983, for violations of Mulligan's rights under the United States Constitution.  This Court has subject matter jurisdiction over the parties and this action pursuant to 28 U.S.C. § 1343(3), 28 U.S.C. § 1331 and 28 U.S.C. § 1367; and under principles of pendent jurisdiction.

39.     This suit seeks the imposition of compensatory and punitive damages against all Defendants as permitted by law.

40.     Venue is proper in this Court because the events or omissions giving rise to each of these causes of action occurred in Los Angeles, California, within the Central District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

41.     Pursuant to Section 910 of the California Government Code, Mulligan has filed claims against the City of Los Angeles; his claims have been denied.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

140886.1

# **FACTS**

42.    James Nichols joined the LAPD in or around 2000.  As of January 2010, and for several years prior thereto, he was assigned to the Hollywood Division.

43.    In or about 2010, the LAPD received a complaint from a woman who alleged that Nichols, under color of his police authority, ordered her into his car, drove her to a secluded location, and assaulted her.

44.    To date, at least four women have made similar allegations against Nichols.  The allegations are consistent in detail and stretch from 2006 through 2012.

45.    Nichols' modus operandi was as follows: he selected a victim, detained the person, drove to a secluded spot, then assaulted the person on threat of arrest and imprisonment.  He thereby used — and abused — his power.

46.    That modus operandi is similar to the one Nichols employed on Mulligan: Nichols selected Mulligan as a victim, detained Mulligan, forcibly transported Mulligan to a secluded location (the Highland Park Motel, where he forced Mulligan into a room), gave him back the thousands of dollars in cash he had taken from Mulligan's car, and ordered Mulligan to stay there overnight by threat of force.  Nichols thereby used — and abused — his power.

47.    The Internal Affairs Division of the LAPD opened an investigation into Nichols in or around 2010.  Between 2010 and 2012, that investigation uncovered evidence of Nichols' malfeasance.

48.    Despite this evidence, the LAPD took no disciplinary or preventative action against Nichols.  The LAPD left Nichols on patrol, and transferred him from the Hollywood Division to the Northeast Division, where his abuse of power continued, including his assault on Mulligan.

## **Mulligan Is Stopped by Nichols and Miller.**

49.    On May 15, 2012, around 10:00 p.m., Mulligan was walking in the Eagle Rock neighborhood of Los Angeles when Defendants Nichols and Miller, uniformed patrol officers with the Los Angeles Police Department, stopped him.  When Mulligan

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

asked why he was being stopped, Nichols and Miller made Mulligan take a field sobriety test and narcotics evaluation.  They called Mulligan names such as "crack-head" and "meth addict."  Mulligan passed all of the sobriety/drug tests: the neurological Romberg evaluation, the one-leg standing test, and pupil and pulse checks.  Mulligan, who was then fifty-two years old, was wearing khaki slacks and a polo shirt.

50.    Nichols and Miller searched Mulligan, handcuffed him, put him in their patrol car, and drove to Mulligan's car.  They searched Mulligan's car, without Mulligan's consent.  They found nothing illegal, but they did find the approximately $3,000 in cash he was carrying in his car.  They took the cash, along with Mulligan's car keys, and left Mulligan's cell phone in the car.

51.    Nichols and Miller concluded that Mulligan was not drunk, mentally unstable, or under the influence of drugs.  The police report states: "I formed the opinion that Mulligan was not under the influence of drugs."

52.    Nichols and Miller then called for another officer to come to the scene. That officer, Sergeant Santos, arrived and examined Mulligan.  Sgt. Santos agreed that Mulligan was not drunk or under the influence of drugs.

53.    After Sgt. Santos left, Nichols and Miller still refused to release Mulligan.  They detained him despite the absence of any criminal behavior, despite their own conclusion that Mulligan was sober, and despite Mulligan's full cooperation, responsiveness to questions, calm and lucid demeanor, and the fact that he had passed the narcotics and sobriety tests.

54.    They did not arrest him.  Instead, they told him: "You're going to a motel."  They put him back in their patrol car and took him by force, in handcuffs and against his will, to the Highland Park Motel.

## Nichols and Miller Force Mulligan To Check Into A Motel.

55.    Mulligan again asked Nichols and Miller to let him go home.  But despite the absence of any criminal behavior or intoxication on Mulligan's part, or any

140886.1

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

contraband in his possession or in his car, they refused.

56.    Mulligan requested permission to call his wife and have her pick him up and take him home.  Nichols and Miller refused.  Mulligan requested permission to call a taxi.  Nichols and Miller refused.  Mulligan asked whether they would drive him home, if they wouldn't let him go home any other way; they refused.

57.    When they reached the Highland Park Motel, they walked Mulligan into the lobby and removed his handcuffs.  Nichols and Miller ordered Mulligan to check in and pay for the room, and ordered the desk clerk to rent Mulligan a room.  The room rate was $52, but Mulligan had only $44 on him (Nichols and Miller still had the rest of Mulligan's cash).  They ordered the clerk to take the $44 for the room.

58.    In the room, Nichols and Miller gave Mulligan his approximately $3,000 in cash, and told him that if he left, he would be a "dead motherfucker."

59.    Nichols and Miller gave Mulligan's car keys to the front desk clerk and ordered the clerk not to return the keys to Mulligan until the morning.

60.    Mulligan did not want to stay at the motel.  He wanted to go home.  The actions of Nichols and Miller left him shaken and afraid.  He did not think it was normal, or legal, for police officers to order him to stay in a motel against his will.  He feared that he was being set up in some kind of scheme.

61.    So he waited for approximately ten minutes, then looked for the officers outside the room.  Seeing that they had left, Mulligan went to the front desk and was able to obtain his car keys from the clerk.

**Nichols and Miller Attack and Savagely Beat Mulligan.**

62.    Mulligan left the motel and began walking, whereupon he encountered Nichols and Miller again.  When they saw him, they stopped their patrol car, got out, and began running toward him.  Mulligan was terrified and turned to try to run away.  Nichols swung his baton like a baseball bat, striking Mulligan in the face.  The blow shattered Mulligan's facial bones and knocked him to the ground.

63.    Nichols and Miller proceeded to beat Mulligan, striking him repeatedly

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

140886.1

in the face, and causing him grievous, life-threatening injuries.  The motive for their attack on Mulligan was that Mulligan had disobeyed their order to stay in the motel.

64.    Mulligan, stunned, severely injured and bleeding profusely, cried out in pain and begged the officers to stop.  They continued beating him, as he drifted in and out of consciousness.

65.    Nichols and Miller then put Mulligan on the curb and handcuffed his hands behind his back.  Nichols inserted his baton between Mulligan's arms, leaned over Mulligan, and said: "You're going to die tonight of a heroin overdose."  Miller jabbed Mulligan in the back, and Nichols torqued the baton upward using tremendous force, snapping Mulligan's scapula — his shoulder blade.

66.    Mulligan felt searing pain and believed them; he thought he had just been injected with a needle and was going to die.  Nichols told him that they were going to give him "some more heroin," and Nichols and Miller repeated the procedure, torqueing Mulligan's shoulder again.

67.    At all times during the events described above, Mulligan conducted himself lawfully, providing Defendants with no valid cause to detain, pursue, beat or arrest him.  Mulligan never threatened the officers, never attacked them and never resisted them.  The brutal beating inflicted by Nichols and Miller was totally unwarranted, and constitutes excessive force.

**Mulligan Suffers Massive Physical Trauma.**

68.    Mulligan was brought by ambulance to Huntington Memorial Hospital. At the hospital, Mulligan was examined and found to have multiple traumatic injuries, including open bi-lateral nasal fractures, a fracture of the nasal spine of the maxilla, a collapsed nasal valve, deviation of the nasal septum, fractures to the right maxilla, a fractured right scapula and scapular spine, spinal stenosis, lacerations and severe bruising around his nose, ears, eyelids and lips, a major concussion, and brain trauma. Copies of photographs of Mulligan taken in the hospital are attached as **Exhibit "A"** hereto.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400  FAX:(310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

69.     To prevent pieces of his shattered facial bones from migrating into his brain and killing him, Mulligan required emergency surgery at Huntington Memorial Hospital to close the open nasal fracture and lacerations.  Following the initial surgery, Mulligan underwent additional surgeries and procedures in order to repair the lasting damage to his severely destroyed nasal passages.  In addition to pain and disfigurement, the shattering of Mulligan's facial bones impaired his sense of smell and his ability to breathe normally.

### At the Hospital, Mulligan Tests Negative for Illegal Drugs.

70.     When Mulligan was admitted to the hospital, Nichols told hospital staff that Mulligan was on drugs.  But when the medical staff performed comprehensive blood and urine tests for a multitude of drugs, including alcohol, barbiturates, cocaine, opiates, phencyclidine (PCP), antidepressants, benzodiazepines, methamphetamine and cannabinoids, they found no illegal drugs in Mulligan's system.

71.     Nichols' statement was a lie, and a part of Defendants' cover-up, to "justify" the use of excessive force.

### Mulligan Continues To Suffer Extreme Psychological Trauma.

72.     As a result of the detention and assault by Nichols and Miller, Mulligan suffered severe and ongoing emotional trauma, resulting in Post-Traumatic Stress Disorder.  Mulligan has frequent flashbacks regarding the beating, and also suffers debilitating fear and paranoia regarding police.

### Nichols and Miller Submit a False and Misleading Police Report; and Then in Furtherance of Their Cover-up, LAPD Officials Hold a Press Conference.

73.     Nichols and Miller submitted an arrest report regarding their interactions with Mulligan.  In this report, the officers fabricated details and omitted relevant facts regarding their interactions with Mulligan, putting the blame for the beating on Mulligan.  The report contains numerous false statements, including the following:

- that Mulligan spontaneously asked Nichols and Miller to take him to the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

Highland Park Motel;

- that Nichols and Miller returned all of Mulligan's property to him when he checked in;

- that when Nichols and Miller chased Mulligan, Mulligan "abruptly turned around and took a combative stance, by arching his back, holding up both arms above his head, and contorting his hands in a claw-like manner while simultaneously baring his teeth and snarling";

- that Mulligan attempted to strike Nichols with both hands;

- that Mulligan lunged toward Nichols and attempted to tackle him; and

- that Mulligan continued to resist arrest such that "6-8 officers" were required to hold him down.

74.     On or about August 12, 2012, upon learning that Mulligan had consulted an attorney and was considering filing a claim against the City of Los Angeles, the LAPD leaked the police report to the media.  Various LAPD officers, including Lt. Andrew Nieman, held a press conference and made official statements to the media which repeated the false statements in the police report.

75.     Despite the LAPD's allegations, no charges were ever filed against Mulligan.

**The Defendants Retaliate Against Mulligan for Exercising His Rights.**

76.     Because of the harm to his reputation caused by these false statements, Mulligan submitted a second claim for damages, this time based on the false statements made by the LAPD and its officers to the media.  In retaliation, the LAPD, Nieman and other unknown LAPD officers conspired with Defendant LAPPL and its president, Defendant Tyler Izen.

77.     The unknown LAPD officers gave the LAPPL and Izen an audiotape of Mulligan that had been surreptitiously made by an officer of the Glendale Police Department on May 13, 2012, two days before the beating, when Mulligan had gone to a Glendale police station seeking advice.  Mulligan grew up in Glendale and trusted

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

140886.1

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    the Glendale police.

2        78.    Mulligan went to the Glendale police station on May 13, 2012, because

3    an acquaintance had given him a product to take.  Mulligan and the acquaintance had

4    been having a conversation about jet lag, and the acquaintance told Mulligan that the

5    product would help alleviate the symptoms of jet lag.  The acquaintance told Mulligan

6    that the product was legal.

7        79.    Mulligan spoke to Glendale Officer Peter Robinson ("Robinson") on the

8    sidewalk outside the police station.  The conversation was cordial and lasted

9    approximately ten minutes.  Unbeknownst to Mulligan, Robinson recorded the

10   conversation.  Robinson also told his Sergeant, Glendale Sgt. Quintero, about the

11   conversation.

12       80.    At some point in August 2012, Quintero read a news account of the

13   May 15 incident.  He told an LAPD officer about Robinson's conversation with

14   Mulligan.

15       81.    Approximately two weeks later, two LAPD officers assigned to the Force

16   Investigation Division, Lt. Bob Lopez and Sgt. John Roda ("Roda"), contacted the

17   Glendale Police Department, asking for the recording.  The Police Department

18   referred them to the Glendale City Attorney's Office.  Ann Maurer ("Maurer"), an

19   attorney in that office, spoke with Sgt. Roda.  Roda told Maurer that he was working

20   on the official LAPD use-of-force investigation into the Mulligan incident, and that

21   the LAPD needed the recording for that investigation.

22       82.    Maurer consulted with Michael Garcia, the Glendale City Attorney, who

23   approved releasing the recording for use in the LAPD use-of-force investigation.

24   Maurer then gave Roda the recording at some point during the week of

25   September 17 - 21, 2012.  Neither the Glendale Police Department, nor the Glendale

26   City Attorney's Office, shared the recording with anyone other than LAPD Sgt. Roda.

27       83.    Following Maurer's release of the recording, Roda, Lopez and/or

28   unknown LAPD officers working in concert with them, gave the recording to

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

Defendants Tyler Izen and the Los Angeles Police Protective League for the purpose of publicly humiliating Mulligan, damaging his credibility, and intimidating and prejudicing him in connection with his attempts to seek legal redress.

84.    On or about October 15, 2012, Izen and the LAPPL publicly released the Glendale recording by posting it on the LAPPL website, along with an accompanying press release attacking Mulligan. In that press release (a copy of which is attached as **Exhibit "B"**), the LAPPL made false, derogatory and threatening statements regarding Mulligan, including the following:

- falsely implying that Mulligan had a role in causing the country's 2008 financial collapse;
- falsely stating that Mulligan was suffering from delusions as a result of drug use and invented the entire incident;
- falsely asserting that Mulligan was under the influence of narcotics when Nichols and Miller beat him;
- falsely asserting that Mulligan abused illicit narcotics; and
- threatening that Mulligan would be "held accountable" if he did not drop his legal claims and apologize to Officers Nichols and Miller.

85.    The news release included a link to the audio recording described above, which had been provided to the LAPD by the Glendale City Attorney's Office for the purpose of the LAPD's use-of-force investigation. The recording was, and remains, cached on the LAPPL's website.

86.    Lopez, Roda and/or one or more unknown LAPD officers or others working in concert with them, with access to the LAPD's use-of-force investigation, gave the tape to Izen and the LAPPL, with the intent to smear, disparage, discredit and intimidate Mulligan.

87.    The LAPD, and the LAPPL and Izen, maliciously conspired to, and did, retaliate against Mulligan for exercising his First Amendment rights to speak publicly and pursue legal recourse.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

88.   The LAPPL, Izen and the LAPD officers with whom they acted, sought to, and intended to, deter Mulligan from pursuing legal action.  Izen, in the press release, specifically stated that Mulligan should drop pending claims or lawsuits: "Hopefully, now that the truth is coming out, instead of continuing to spend his money on lawyers and trying to weave a fictitious tale of abuse at the hands of the LAPD, Mulligan will seek the substance abuse treatment he so badly needs."

89.   The LAPD, the LAPPL and Izen sought to, and intended to, embarrass and harass Mulligan and create adverse consequences for Mulligan with his employer, Deutsche Bank.  Their press release references Deutsche Bank by name in its opening paragraph, states that Mulligan is a "high-powered banker" for Deutsche Bank and implies that bankers in general are liars who are responsible for the 2008 nationwide financial crisis.

90.   The press release contained defamatory falsehoods.  And as the LAPD, the LAPPL and Izen knew, Deutsche Bank would be particularly sensitive to negative publicity.

91.   On November 5, 2012, Mulligan's employer, Deutsche Bank, fired him. Deutsche Bank provided a written statement of reasons for the termination, as follows: "concerns about publicized disclosures related to personal matter."

92.   The actions set forth above constitute a conspiracy by the LAPD, certain of its officers, and the LAPPL and certain of its members, officers or employees, including Tyler Izen, to retaliate against Mulligan for speaking publicly about, and filing administrative claims based on, the beating and subsequent media statements by the LAPD; to intimidate him and deter him from engaging in public speech about the beating; and to obstruct and hinder his access to legal recourse by tainting the public perception of him so as to prejudice and deny him his right to an impartial jury.

93.   Defendants' conduct was unconscionable.  Nichols and Miller severely beat Mulligan, an unarmed fifty-two year-old man, who was not resisting or threatening them.  They inflicted injuries that required Mulligan to undergo multiple

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

140886.1

1  surgeries.  They did this without any legal justification, because Mulligan disobeyed
2  an illegal order to spend the night in a motel with thousands of dollars in cash on his
3  person.

4    94.    When Mulligan exercised his right to seek legal redress, the LAPD, the
5  LAPPL and Izen retaliated against him by releasing otherwise confidential
6  investigative materials to the media, naming and embarrassing his employer, accusing
7  him of drug addiction, and implying that he got what was coming to him and needs to
8  be "held accountable" for filing a claim.

9    95.    As a result, Mulligan lost his job, his career, and his reputation.  His life
10  has been devastated.

11  **The LAPD Left A Suspected Serial Predator Unchecked for More Than**
12  **Two Years, Then Attacked the First Victim to Publicly Speak Out.**

13    96.    The LAPD was on notice that Nichols was a serial predator, who was
14  using his badge to prey on vulnerable victims.  Yet it did not stop him.  In the
15  meantime, Nichols targeted more victims, including Mulligan.

16    97.    When Mulligan spoke out about what had been done to him, the LAPD
17  conspired with the LAPPL and its leader, Tyler Izen, to impugn Mulligan.
18  Accordingly, Defendants LAPPL and Izen are deemed to be, and under the law are,
19  "state actors"; and as such, they are jointly and severally liable with the other
20  Defendants for the violations of Mulligan's civil rights.

21    98.    There is no justification for using a baton to beat an unarmed, non-violent
22  man, and then to break his shoulder blade while he is handcuffed.  And there is no
23  justification for retaliating against him for speaking out and seeking legal redress for
24  the beating.

25    99.    The willful and coordinated acts described herein resulted in the
26  systematic destruction of Mulligan's life and career.

27
28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

# FIRST CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

## (Against DEFENDANTS NICHOLS AND MILLER)

100.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

101.   This cause of action is brought pursuant to 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments of the United States Constitution.

102.   Defendants Nichols and Miller, without cause, viciously attacked and beat Mulligan without any justification or legal basis.  Defendants Nichols and Miller knocked Mulligan to the ground, repeatedly struck him in the face, and unnecessarily and without justification torqued his shoulder with a baton while he was handcuffed, causing severe injuries to him through the unlawful use of excessive force.

103.   In the process, Defendants violated Mulligan's constitutional right to be free from unlawful detentions, seizures and excessive force as secured by the Fourth and Fourteenth Amendments.

104.   Defendants acted under color of state law and within the course and scope of their employment with the City of Los Angeles and the Los Angeles Police Department in deploying excessive force against Mulligan.  Defendants also searched and seized, and falsely imprisoned, Mulligan in the absence of probable cause and in violation of his legal rights.

105.   Defendants' actions directly and proximately caused injury to Mulligan.

106.   As a result of Defendants' actions, Mulligan has suffered damages in excess of $20 million, according to proof at trial.

107.   Defendants' actions were taken in knowing violation of Mulligan's legal and constitutional rights, and without good faith.  Punitive damages against the police officers individually are thus warranted.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

## SECOND CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS, CALIFORNIA CIVIL CODE § 52.1

### (Against DEFENDANTS NICHOLS, MILLER AND

### THE CITY OF LOS ANGELES)

108.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph in this Complaint as though fully set forth herein.

109.   The United States Constitution, Amendment IV, and the California Constitution, Article I, Section 13, guarantee (a) the right of persons to be free from excessive force, (b) the right of persons to be free from unreasonable search and seizure, and (c) the right of individuals to due process of law.  Defendants, by engaging in the wrongful conduct alleged herein, denied these rights to Mulligan, thus giving rise to claims for damages pursuant to California Civil Code Section 52.1.

110.   As a direct and proximate cause of the aforementioned acts of Defendants, Mulligan was injured as set forth above, and is entitled to damages in excess of $20 million, as well as punitive damages, according to proof at trial.

111.   In doing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of Mulligan.  The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

## THIRD CAUSE OF ACTION

### ASSAULT AND BATTERY

### (Against DEFENDANTS NICHOLS, MILLER AND

### THE CITY OF LOS ANGELES)

112.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

113.   As an actual and proximate result of the wrongful and malicious acts of Defendants Nichols and Miller, conducted without due care in the execution and

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

enforcement of the law, Mulligan was placed in great fear for his life and physical well-being.

114.   As an actual and proximate result of the wrongful and malicious acts of Defendants Nichols and Miller, conducted without due care in the execution and enforcement of the law, Mulligan has suffered extreme and severe physical pain and suffering and has been injured in his body in an amount according to proof.

115.   As an actual and proximate result of the wrongful and malicious acts of Defendants Nichols and Miller, conducted without due care in the execution and enforcement of the law, Mulligan has suffered extreme and severe mental anguish and has suffered mental injuries in an amount according to proof.

116.   The aforementioned conduct of Defendants Nichols and Miller was intended to cause injury to Mulligan, or in the alternative, was despicable conduct carried on with a willful and conscious disregard for the rights and safety of others, and subjected Mulligan to cruel and unjust hardship in conscious disregard of Mulligan's rights so as to justify an award of exemplary and punitive damages.

117.   In conducting themselves as herein described, Defendants Nichols and Miller were acting within the course and scope of their employment as law officers with the Defendant City of Los Angeles and its Los Angeles Police Department and caused Mulligan to sustain damages in excess of $20 million, according to proof at trial.

## FOURTH CAUSE OF ACTION
### FALSE IMPRISONMENT
### (Against DEFENDANTS NICHOLS, MILLER AND
### THE CITY OF LOS ANGELES)

118.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

119.   Defendants Nichols and Miller, while working as police officers for the City of Los Angeles, and acting within the course and scope of their duties, seized,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

detained, arrested and caused the detention of Mulligan without a warrant, probable cause, reasonable suspicion or any legal justification.

120.   As a result of Defendants Nichols' and Miller's false arrest and imprisonment of Mulligan, Mulligan has incurred and will continue to incur damage, including but not limited to great pain, suffering, and severe emotional and mental distress in excess of $20 million, according to proof at trial.

121.   The conduct of Defendants Nichols and Miller was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Mulligan, entitling Mulligan to an award of exemplary and punitive damages.

## FIFTH CAUSE OF ACTION
## (POLICE NEGLIGENCE)
### (Against DEFENDANTS NICHOLS, MILLER AND
### THE CITY OF LOS ANGELES)

122.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein, except for any and all allegations of intentional, malicious, or wanton conduct.

123.   At all times herein mentioned, Defendants owed a duty of care to Mulligan to avoid causing unnecessary physical harm and distress in the execution and enforcement of the law.  In conducting themselves as herein alleged, Defendants failed to comply with this duty.

124.   As an actual and proximate result of the negligent acts of Defendants herein alleged, conducted without due care in the execution and enforcement of the law, Mulligan suffered severe physical injury, extreme emotional and mental distress and other damages set forth hereinafter in excess of $20 million, according to proof at trial.

125.   In conducting themselves as herein alleged, Defendants Nichols and Miller were acting within the course and scope of their employment with Defendant City of Los Angeles.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

# SIXTH CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

## (Against DEFENDANTS THE CITY OF LOS ANGELES, UNKNOWN DEFENDANTS DOES 1-10, LOS ANGELES POLICE PROTECTIVE LEAGUE AND TYLER IZEN)

126.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

127.   The LAPD, Lopez, Roda and one or more known or unknown LAPD officers, including Does 1-10, with access to the LAPD's use-of-force investigation and the Glendale audiotape, conspired with the LAPPL and Izen to smear, disparage, discredit, and intimidate Mulligan by releasing the tape publicly.

128.   Those unknown officers, the LAPD, the LAPPL, and Izen intended to retaliate against Mulligan for exercising his First Amendment rights to speak publicly and pursue legal recourse.

129.   The LAPD, the LAPPL, and Izen sought to deter Mulligan from pursuing legal action.  Izen specifically stated: "Hopefully, now that the truth is coming out, instead of continuing to spend his money on lawyers and trying to weave a fictitious tale of abuse at the hands of the LAPD, Mulligan will seek the substance abuse treatment he so badly needs."

130.   Those unknown officers, the LAPD, the LAPPL and Izen intended to coerce and embarrass Mulligan and create adverse consequences for Mulligan at his employer, Deutsche Bank.  The press release mentions Deutsche Bank in its opening paragraph, states that Mulligan is a "high-powered banker" for Deutsche Bank, and implies that bankers in general are liars who were responsible for the 2008 financial crisis.  As Izen and the LAPPL knew, Deutsche Bank is involved in lawsuits relating to the financial crisis and would be particularly sensitive to negative publicity.

131.   The actions set forth herein constitute a conspiracy by the LAPD, certain of its officers, including Does 1-10, the LAPPL, and certain of its members, officers,

140886.1

or employees including Tyler Izen, to retaliate against Mulligan for speaking out about, and filing claims based on, the beating and subsequent media statements by LAPD officers; to deter Mulligan from engaging in speech about the beating; to obstruct and hinder his access to legal recourse by tainting the public perception of Mulligan so as to deny him an impartial jury; and has caused damages in excess of $20 million, according to proof at trial.

## SEVENTH CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS (Cal. Civ. Code § 52.1)

### (Against DEFENDANTS THE CITY OF LOS ANGELES, UNKNOWN DEFENDANTS DOES 1-10, LOS ANGELES POLICE PROTECTIVE LEAGUE AND TYLER IZEN)

132.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein.

133.   The actions set forth above constitute a conspiracy by the LAPD, certain of its officers, including Does 1-10, the LAPPL, and certain of its members, officers or employees including Tyler Izen, to retaliate against Mulligan for speaking out about, and filing claims based on, the beating and subsequent media statements by LAPD officers; to deter Mulligan from engaging in speech about the beating; and to obstruct and hinder his access to legal recourse by tainting the public perception of Mulligan so as to deny him an impartial jury.

134.   The United States Constitution, Amendment I, and the California Constitution, Article I, Sections 2 and 3, guarantee Mulligan the right to speak publicly and to seek redress of his grievances from the government.  Defendants, by engaging in the wrongful conduct alleged herein, used their government offices and power to retaliate against Mulligan for exercising these rights, seeking thereby to interfere by threats, intimidation and coercion with Mulligan's exercise of his rights, thus giving rise to claims for damages pursuant to California Civil Code Section 52.1.

135.   As a direct and proximate cause of the aforementioned acts of

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

140886.1

Defendants, Mulligan was injured as set forth above, and is entitled to damages in excess of $20 million, according to proof at trial, as well as punitive damages.

136.   In committing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of Mulligan. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

## EIGHTH CAUSE OF ACTION
## NEGLIGENT SUPERVISION
## (Against UNKNOWN DEFENDANTS DOES 1-10
## AND THE CITY OF LOS ANGELES)

137.   Mulligan refers to and incorporates by reference each foregoing and subsequent paragraph of this Complaint as though fully set forth herein, except for any and all allegations of intentional, malicious, or wanton conduct.

138.   The contact between Defendant Nichols and Mulligan occurred directly through, as part of, and as a result of the employment relationship between Nichols and Defendant LAPD.

139.   Certain unknown Defendants among Does 1-10 are LAPD officers responsible for the supervision of Nichols and/or the investigation of the allegations against him.  They failed in their duty to adequately and properly supervise Nichols and control him.  Supervisory officers of the LAPD made the deliberate decision between 2010 and 2012 to leave Nichols on patrol, and to transfer Nichols to the Northeast Division.

140.   Defendants made these decisions despite having actual knowledge of allegations of Nichols' abuse of his police authority to engage in extortion and assault. At the time Defendants made those decisions, they had knowledge that Nichols could not be trusted to properly carry out his duties as a police officer.  The decisions made

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

by Defendants to leave Nichols on patrol despite allegations of predatory, abusive and assaultive conduct were the proximate cause of Mulligan's injuries.

141.   Prior to the May 15, 2012 beating of Brian Mulligan, the likelihood that Nichols was continuing to engage in predatory and abusive conduct, such as that detailed herein, was foreseeable by the LAPD and its supervisory officers, based on the allegations of similar conduct made by Nichols' prior victims.

142.   The LAPD is liable under respondeat superior for the individual negligent acts of its supervisory employees in failing to properly supervise Nichols, and take him off the street.

143.   At all times herein mentioned, Unknown Defendants Does 1-10 had a duty to properly monitor and supervise the LAPD officers for whom they were responsible, so as to identify officers who were criminally abusing their authority. Defendants failed to comply with this duty.

144.   As an actual and proximate result of the negligent acts herein alleged, conducted without due care in the execution and enforcement of the law, Mulligan suffered severe and permanent physical injuries, extreme emotional and mental distress, and other damages set forth hereinafter in excess of $20 million, according to proof at trial.

///

///

///

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

## PRAYER FOR RELIEF

**WHEREFORE**, Mulligan prays for judgment, as follows:

1.  For damages in excess of $20 million, including general damages, special damages, punitive damages and economic damages, in accordance with proof at trial; and

2.  For attorneys' fees, costs and interest; and for such other and further relief as the Court deems just and proper.

DATED:  February ___6___, 2013        MILLER BARONDESS, LLP

By: _____

LOUIS R. MILLER
Attorneys for Plaintiff
Brian C. Mulligan

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1, Mulligan hereby demands a trial by jury.

DATED:  February ___6___, 2013        MILLER BARONDESS, LLP

By: _____

LOUIS R. MILLER
Attorneys for Plaintiff
Brian C. Mulligan

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

140886.1

# EXHIBIT A





# EXHIBIT B

LAPPL - Los Angeles Police Protective League: Self-Admitted Bath Salts User Attempts ...   Page 1 of 2

Email address
ZIP code                    Click Here»

| HOME | ABOUT US | COMMUNITY | NEWS | MULTIMEDIA | EAGLE & BADGE | THIN BLUE LINE | CONTACT US | BLOG |

Home » News » News Releases

Email  Print

Share

## Self-Admitted Bath Salts User Attempts To Shake Down The LAPD



LOS ANGELES POLICE PROTECTIVE LEAGUE
NEWS RELEASE

### Self-Admitted Bath Salts User Attempts To Shake Down The LAPD

Los Angeles, October 15, 2012– The truthfulness of many bankers was questioned following the 2008 financial collapse. The tales some of them wove unraveled as they drove the collapse of the financial system. So, what do you get when you cross a user of **bath salts** with a banker who seeks a payday from the City of Los Angeles? Meet **Brian Mulligan** – the man best known for his day job as a high-powered banker with Deutsche Bank. Less known about Mulligan is that he, by his own admission, was a frequent user of "bath salts," a substance that causes euphoric sensations and violent delusions.

Mulligan brought himself to the public eye recently with a wild, lurid lawsuit against the LAPD. As recounted in **John Millers report on the CBS evening news**, Mulligan's story reads like a bad screenplay rejected by Fox TV or Universal Pictures, where he had previously been an executive. As detailed by **Richard Winton Los Angeles Times**, Mulligan accused LAPD officers of detaining him on May 15, 2012, forcing him into a low rent motel, threatening him with death if he left, and then beating him severely when he fled.

"Bath salts lead to delusion, and as in this case, bizarre lawsuits," said Tyler Izen, president of the Los Angeles Police Protective League. "Hopefully, now that the truth is coming out, instead of continuing to spend his money on lawyers and trying to weave a fictitious tale of abuse at the hands of the LAPD, Mulligan will seek the substance abuse treatment he so clearly needs."

The LAPD acknowledged that they had encountered Mulligan after receiving calls he had been **trying to enter into vehicles in a Highland Park neighborhood.** According to news reports regarding the arrest report, Mulligan admitted to LAPD officers he had recently ingested bath salts, but slept for days, and felt depressed. According to news reports, at his request Mulligan was dropped at the low rent motel building. Sometime later, officers again spotted him trying to break into cars. After a short foot chase, officers caught up with him. Mulligan took a fighting stance and reasonable force was used to arrest him. Through his attorney at the time, J. Michael Flanagan, Mulligan adamantly denied ever admitting to LAPD officers that he used "white lightning," a commercial name for bath salts.

But, unfortunately for Mr. Mulligan and fortunately for the truth, his own voice caught on audiotape proves he was a regular user of bath salts. After seeing a story about Mr. Mulligan in the daily NewsWatch, distributed by the **Los Angeles Police Protective League**, officers from the Glendale Police Department recognized Mr. Mulligan from their own encounter with Mulligan two days before the initial LAPD contact on May 13, 2012.

In that situation, Mulligan contacted the Glendale Police Department dispatch and flagged down a Glendale police officer in front of the Glendale Police Department, claiming that helicopters were following him. That Glendale police officer spoke to Mulligan for approximately 11 minutes.

After the officer assured Mulligan there were no helicopters following him, Mulligan stated to the officer, "I could be nuts... I am a little paranoid." During the subsequent conversation, Mulligan admitted using bath salts approximately 20 times, with his last use just "two weeks ago," and that his family was aware of his use of the drug.

The unedited version of Mulligan's tape-recorded conversation can be heard here.

"Years ago, former Secretary of Labor Ray Donovan was acquitted of criminal fraud charges," Izen recalled. "On the courthouse steps, following acquittal, the only thing he asked was, 'Where do I go to get my reputation back?' Well, like Secretary Donovan, two LAPD officers' reputations are permanently blemished. When the internal LAPD process is completed and the officers are cleared of all wrongdoing, it is unlikely that Mr. Mulligan will apologize or be held accountable for his slanderous allegations – and that is wrong," concluded Izen.

**Background on Bath Salts**
**Bath salts possess intoxicating effects** similar to methamphetamine and cocaine. In 2011, Governor Brown signed legislation signed legislation **(AB 486)** that made it a misdemeanor to sell or distribute synthetic stimulants that are marketed and packaged as incense and bath salts. People who smoke, snort or inject the synthetic white-powder drug, **often suffer** from hallucinations, psychosis, paranoia, agitation, combativeness or violent behavior.

* * *

### Membership / Sidebar
MEMBERSHIP REGISTRATION

LOG IN

MEMBERSHIP ALERTS

MEMBERS ONLY

CAREER DEVELOPMENT

CALENDAR

JOIN THE LAPD

Find us on Facebook   Like


LAPPL BLOG


MEMORIALS GO NOW ▶


PUBLIC SAFETY FIRST


follow LAPPL on twitter



Featured tweet
LAPPL: Would you wan...
Oct 05, 2012
LAPPL: Would you want to wake up and find Bruce Davis, described as a "right-hand man" to Charles Manson, next...

Recent tweets
LAPPL: Officers are called...
LAPPL: The GPS tracker kn...
LAPPL: Have you seen this...
LAPPL: Would you want to...
LAPPL: RT @NLEOMF: RIP...

RECENT NEWS

Jan 30, 2013
Super Bowl safety tips from LAPD
Calabasas Patch
The Los Angeles Police Department wants you to be safe while enjoying the big game festivities.

Jan 27, 2013
LA leads nation in hit/run collisions, councilman says
NBC 4
Councilman Joe Buscaino says Los Angeles drivers face nearly half of all reported traffic collisions.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge R. Gary Klausner and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV13- 836 RGK (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

CV-18 (03/06)　　　NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Louis R. Miller (State Bar No.: 54141)
smiller@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| BRIAN C. MULLIGAN, an individual, | CASE NUMBER |
|---|---|
| PLAINTIFF(S)<br><br>v.<br><br>JAMES NICHOLS, an individual; JOHN MILLER, an individual; THE CITY OF LOS ANGELES, an entity; TYLER IZEN, an individual; LOS ANGELES POLICE PROTECTIVE LEAGUE, a corporation; and DOES 1-10, inclusive,<br><br>DEFENDANT(S). | CV13-00836-RGK (VBCx)<br><br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Louis R. Miller, Esq._____, whose address is _Miller Barondess, LLP, 1999 Avenue of the Stars, Suite 1000, Los Angeles, CA  90067_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___ FEB - 6 2013 ___

By: _____
MARILYN DAVIS
Deputy Clerk

(Seal of the Court)

_[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)]._

CV-01A (10/11)                                                                SUMMONS

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
BRIAN C. MULLIGAN, an individual

**DEFENDANTS**
JAMES NICHOLS, an individual; JOHN MILLER, an individual; THE CITY OF LOS ANGELES, an entity; TYLER IZEN, an individual; LOS ANGELES POLICE PROTECTIVE LEAGUE, a corporation; and DOES 1-10, inclusive

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Louis R. Miller (SBN 54141)
smiller@millerbarondess.com
Miller Barondess, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Tel: (310) 552-4400/Fax: (310) 552-8400

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)
☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)
☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT:** $ 20 MILLION

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
1) VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (EXCESSIVE FORCE); 2) VIOLATION OF CALIFORNIA CIVIL CODE § 52.1 (EXCESSIVE FORCE); 3) ASSAULT AND BATTERY; 4) FALSE IMPRISONMENT; 5) POLICE NEGLIGENCE; 6) VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 (RETALIATION); 7) VIOLATION OF CALIFORNIA CIVIL CODE § 52.1 (RETALIATION); 8) NEGLIGENT SUPERVISION

**VII. NATURE OF SUIT** (Place an X in one box only.)

☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Act
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Info. Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 368 Asbestos Personal Injury Product Liability
☐ 462 Naturalization Application
☐ 463 Habeas Corpus-Alien Detainee
☐ 465 Other Immigration Actions

☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 445 American with Disabilities - Employment
☐ 446 American with Disabilities - Other
☒ 440 Other Civil Rights

☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus/ Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS - Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number: CV13-00836

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                     CIVIL COVER SHEET                     Page 1 of 2
                                                                        CCD-JS44

**UNITED STATE** **ISTRICT COURT, CENTRAL DISTRICT** **CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] No   [ ] Yes

If yes, list case number(s):

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [X] No   [ ] Yes

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   [ ] A. Arise from the same or closely related transactions, happenings, or events; or

[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ] Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ] Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):** Louis R. Miller      Date February 6 , 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |